[Dkt. No. 23]

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| DAVID TAHA, | |
| Plaintiff, | Civil No. 14-3377 (RMB/KMW) |
| v. | **OPINION** |
| TBC CORP., | |
| Defendant. | |

APPEARANCES:

James M. Carter, Esq.
Hoffman DiMuzio
4270 Route 42
Turnersville, NJ 08012
    *Attorney for Plaintiff*

Alexander Nemiroff, Esq.
Gordon & Rees, LLP
One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103
    *Attorney for Defendant*

**BUMB**, United States District Judge:

THIS MATTER comes before the Court upon a motion for summary judgment by Defendant TBC Corporation, doing business as National Tire & Battery ("NTB" or the "Defendant"). [Dkt. No. 23.] For the reasons set forth below, the Court denies Defendant's motion for summary judgment.

I.  **BACKGROUND**

   A. **Plaintiff's Employment with Defendant**

It is undisputed for purposes of Defendant's motion for summary judgment that Plaintiff David Taha (the "Plaintiff") was diagnosed with an arthritic condition in 2000. (Def.'s Statement of Undisputed Material Facts[1] [Dkt. No. 23-2] at ¶ 3.) Plaintiff describes his condition as one of multiple-diagnoses including Reflex Sympathetic Dystrophy Syndrome, fibromyalgia, osteoporosis, Reiter's syndrome, and reactive arthritis. (Taha Dep. at 31:12-18.)

The instant litigation arises out of Plaintiff's employment as a store manager at several NTB locations in New Jersey. (SOF at p. 1 & ¶¶ 11, 12.) Plaintiff's employment with NTB began when he filled out an online application for employment on June 17, 2011. (SOF at ¶ 8.) In that application, Plaintiff responded that he could perform the essential requirements of the job and did not respond to a question asking about reasonable accommodations required to perform it.[2] (Id. at ¶ 8.) Plaintiff also stated on his application that his reason for leaving his previous job at a similar store was that he was

---

[1] Hereinafter, references to undisputed facts in this statement will be cited: "(SOF at ¶ ___.)"
[2] During his deposition, Plaintiff did not dispute this, but did testify that he provided a note soon after his employment began indicating his disability. (Taha Dep. 131:1-4.)

2

"Laid Off/Position Eliminated." (Id. at ¶ 8.) In reality, Plaintiff had been terminated from this job and the police were called to remove Plaintiff from the premises. (Id.)

Application discrepancies aside, Plaintiff was trained by Justin Immordino, who at that time was a store manager in NTB's Deptford, New Jersey location. (Id. at ¶ 9.) Although Plaintiff claims a conflict arose later with Mr. Immordino as described below, during Plaintiff's training with him, Plaintiff took no issue with him, nor did Plaintiff make any mention that he was disabled in any way. (Id. at ¶ 10.) After he received his training at the Deptford Store, Plaintiff became the store manager of the Maple Shade, New Jersey store location. (Id. at ¶ 11.) Plaintiff's chief role was to manage and direct the operations of his NTB store, which sold tires and related automotive parts and services. (Id.) Plaintiff's duties in that capacity included "meeting performance standards for customers, building and maintaining a team effort in the store, and ensuring continuous implementation of enforcement of company policies and procedures." (Id. at ¶ 12.)

Plaintiff's performance as a store manager at the Maple Shade location was not without issues. On January 5, 2012 NTB received a written complaint from a regular customer stating that Plaintiff had displayed a "lack of professionalism." The complaint went on to state, "I've been a customer of NTB Maple

3

Shade since it opened many years ago.  I've seen personnel come and go[] at every position.  I have never, ever encountered a manager so rude, unprofessional, and pompous."  (Id. at ¶ 12.) Plaintiff does not contest this complaint was levied against him, however, Plaintiff does assert that this customer had "a long history of customer complaints . . . at least 30 prior to [his] arrival . . . ."  (Taha Dep. 107:24-108:3.)

On April 20, 2012, NTB provided Plaintiff with a written warning for poor store performance.  (SOF at ¶ 15.)  Ten days later, NTB received another complaint from a customer about Plaintiff's rude behavior.  (Id. at ¶ 16.)  Another complaint followed also indicating that Plaintiff was rude and unhelpful on July 22, 2014.  (Id. at ¶ 17.)  Two days after receiving the July 22, 2012 complaint, Mr. Immordino, who had shifted from also being a store manager to being Plaintiff's supervisor,[3] gave Plaintiff a written warning, which stated "[Plaintiff] has received a complaint about being rude and yelling at a customer. This is not the first complaint that I have had about [Plaintiff] being rude to customers."  (Id. at ¶ 18.)  Mr. Immordino provided Plaintiff with a copy of the written warning

---

[3] Plaintiff strongly disagreed with Mr. Immordino's management style as his supervisor.  (Taha Dep. 164:1-7 ("Q: You don't like Mr. Immordino; is that right? A: Mr. Immordino terminated my employment.  So if somebody is a bigot, if somebody violates the laws of the land and does unethical things and harms you physically, emotionally, there isn't much to like.").)

4

to sign, but Plaintiff does not contest that he refused to sign the warning. (Id.)

Instead, three days after receiving the written warning from Mr. Immordino, Plaintiff e-mailed employees at NTB indicating that he was requesting reasonable accommodations for a disability pursuant to the Americans with Disabilities Act (ADA). (Id. at ¶ 19.) He also stated that his attorney, James Carter,[4] would be contacting NTB. (Id.). The next day, another complaint about Plaintiff's behavior was made, again for being consistently rude. (Id. at ¶ 20.)

On July 31, 2012, Plaintiff's attorney James Carter represented to NTB that Plaintiff was unable to work more than fifty hours per week and needed a stool to sit on periodically during his shifts. (Id. at ¶ 21.) NTB responded with questions concerning Plaintiff's impairment. (Taha Dep. Ex. 15.) In the answer to those questions, Plaintiff stated he was diagnosed in 2000 with reactive arthritis and in 2005 with "RDS and bone loss." (Id.) He stated that the impairment caused him to feel fatigue and pain, but was able to perform all essential functions of the job, provided he could periodically sit and not work more than fifty hours per week. (Id.) Plaintiff also provided a note from his physician corroborating his requested

---

[4] Mr. Carter also represents Plaintiff in the instant action.

5

accommodations on August 2, 2012.  (SOF at ¶ 23.)  Thereafter, Plaintiff obtained a stool to sit on and Plaintiff worked, on average, 48.29 hours per week following the submission of his request for accommodations.  (Id. at ¶ 24.)

On April 29, 2013, after being transferred to another store location in Millville, New Jersey,[5] Plaintiff received a written warning for being rude to a customer after refusing to perform a service on the customer's car and "belittling her in front of other customers."  (Taha Dep. Ex. 19.)  On May 16, 2013, a fellow employee at the Millville store complained that Plaintiff would take credit for sales he did not perform.  (Id. at Ex. 21.)  The following month, Plaintiff sent an ADA note to NTB, asking to begin a scheduled inventory in the morning, rather than in the afternoon.  (Id. at Ex. 22.)  NTB accommodated this request.  (SOF at ¶ 30.)

On July 19, 2013, Mr. Immordino contacted Plaintiff to speak with him about a customer complaint.  During that call, Defendant contends that Plaintiff resigned.  Plaintiff contends that he advised Mr. Immordino that he was "considering to just either go on FMLA or resign . . . ."  (Taha Dep. 203:3-15.)

---

[5] Plaintiff concedes that it is common for store managers to be transferred and that he did not receive a reduction in pay or benefits. (Id. at ¶¶ 26-27.)  However, Plaintiff contends that the conditions in the new store were drastically worse that in the previous store.  (Taha Dep. at 167:11-168:1.)

6

After the call, Mr. Immordino contacted the human resources manager for Plaintiff's region, Sherif Kamel, and informed him that Plaintiff had resigned his position. (SOF at ¶ 32.) Around that time, Plaintiff sent an e-mail to NTB employees detailing complaints about having been transferred to a different store, alleging breaches of employment contracts and threatening legal action against Defendant. (Id. at 33.)

Later that evening, after Plaintiff's discussion with Mr. Immordino and subsequent e-mail lodging complaints against his employer, Mr. Kamel contacted Plaintiff in connection with his complaints. (Id. at ¶ 35.) While it is disputed by Plaintiff, Mr. Kamel provided an affidavit indicating that "[d]uring that conversation, Plaintiff reiterated that he was resigning from NTB." (Kamel Aff. at ¶ 10.) Mr. Kamel goes on to state that minutes after Plaintiff reiterated his desire to resign, Plaintiff called him back after speaking with his attorney and stated that he was advised by his attorney not to resign. (SOF at ¶ 37.) According to Mr. Kamel, Plaintiff then stated that he was unsure what he would do, but would not take any action until speaking to his attorney the following week. (Id.) Plaintiff disputes that he said anything of the sort to Mr. Kamel.[6] (Taha Dep. 201:1-22.)

---

[6] The Court notes that whether Plaintiff relayed communications with his attorney to Mr. Kamel would not be protected by

7

Ultimately, during a July 22, 2013 conference call between Plaintiff, Mr. Kamel, and Mr. Kamel's supervisor, Megan Filoon, Plaintiff was told that Defendant accepted his resignation. (SOF at ¶ 42.) Plaintiff claims he reiterated that he was not resigning. (Taha Dep. at 211:4-7.) Nevertheless, neither party disputes that Plaintiff's employment from that point onward did not continue.

### B. Plaintiff's History with ADA Claims

Plaintiff has an extensive history litigating ADA claims, frequently with his current counsel, Mr. Carter. For instance, on April 16, 2003, Plaintiff was given a performance development plain by his then-employer, Avis Rent a Car System, LLC. (SOF at ¶ 3.) Shortly after receiving that performance development plan, Plaintiff informed his employer that he needed an accommodation due to his disability. Plaintiff thereafter sued his employer for disability discrimination. (Id.) Plaintiff then worked at the Hertz Corporation in 2004, whom he also sued

---

attorney-client privilege. The issue of whether Plaintiff's potential relaying of those communications acts as a waiver for Defendant to inquire into the underlying communications with his lawyer, for purposes of determining whether Mr. Carter instructed Plaintiff to change his story, is a question for another day. If indeed it is determined that Mr. Carter did instruct Plaintiff to retroactively change his story for purposes of preserving a litigation claim, another question may arise: whether such action is sanctionable in the form of an award of attorney fees to Defendant.

8

for constructively discharging him after refusing him the accommodation he requested. (SOF at ¶ 4.)

After that, Plaintiff worked for Jiffy Lube International, Inc. as a store manager. Plaintiff was again placed on a performance improvement plan, and also received a number of complaints and disciplinary actions, including a complaint that Plaintiff was "yelling, cursing and berating his employees." (Id. at ¶ 5.) Plaintiff again sued this employer for disability discrimination, represented by Mr. Carter. (Id.)

Next and finally, Plaintiff got a job as a store manager for Tires Plus. (Id. at ¶ 6.) After a customer complaint was lodged against him, Tires Plus terminated Plaintiff's employment and called the police to remove Plaintiff from the premises. (Id.) Plaintiff again filed a lawsuit alleging disability discrimination, and again was represented by Mr. Carter. (Id.)

## II.  LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." 14 Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id.

9

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 373, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth

10

specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

### III. ANALYSIS

#### A. Plaintiff's Articulated Claim

Through Plaintiff's briefing, he argues as if his claim is one for retaliation under the New Jersey Law Against Discrimination ("NJLAD"). However, the only cause of action contained in the Complaint is for disability discrimination under the NJLAD. (See Compl. at p. 4 ("Violation of the Law Against Discrimination: Disability Discrimination")). Moreover, the facts as set forth under the cause of action heading reading "Disability Discrimination" appear to track the conventional elements for discrimination under the NJLAD, not retaliation. (See, e.g., id. at ¶ 28 "The plaintiff, at all relevant times, was performing his job at a level that met or exceeded or should have met or exceeded the defendant's legitimate expectations.")

11

Finally, at oral argument on the motion for summary judgment, Plaintiff conceded there was no retaliation claim in this case.

Despite this concession, Plaintiff's supplemental brief appears to once again go back to retaliation as the claim at issue. (Pl.'s Supp. Br. at 1 ("The plaintiff assumes for the purpose of this supplemental memorandum that he has satisfied the elements of a <u>prima facie</u> case of retaliation under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 <u>et seq.</u> for reasonable requests for accommodation of his disability.").

The complaint clearly states no cause of action for retaliation. Plaintiff conceded as much at oral argument. The Third Circuit has held that a plaintiff cannot shoehorn a retaliation claim into a discrimination lawsuit when it is not contained in the complaint. <u>Knabe v. Boury Corp.</u>, 114 F.3d 407, 408 n.1 (3d Cir. 1997). Likewise, faced with a similar predicament in <u>Hyman v. Atlantic City Medical Center</u>, No. Civ. A. 97-795 (JEI), 1998 WL 135249 (D.N.J. Mar. 16, 1998), the court held that it would "not consider[] Hyman's assertions of retaliation, which are raised for the first time in her brief, as a separate claim of retaliatory discharge. Plaintiff's Complaint fails to plead a retaliation count and asserts no facts in support of such a claim." <u>Id.</u> at *12 n.8. This Court

12

is no more willing to permit Plaintiff's late-arriving cause of action for retaliation to go forward.[7]

**B. Discrimination Under the NJLAD**

Plaintiff's sole claim is for disability discrimination under the NJLAD. Under the NJLAD, a disability discrimination claim such as Plaintiff's is adjudicated under the familiar McDonnell Douglas burden-shifting framework. Tourtellotte v. Eli Lilly and Co., No. 15-1090, 2016 WL 146455 (3d Cir. Jan. 13, 2016); see generally McDonnell Douglas v. Green, 411 U.S. 792 (1973). Under that framework, to establish a prima facie case of discriminatory discharge under the NJLAD, a plaintiff is required to show that: "(1) she is the member of a protected class, specifically that she has or is perceived to have a disability as defined by the NJLAD; (2) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; (3) she experienced an adverse employment action; and (4) the employer sought someone else to perform the same work, or did fill the position with a similarly-qualified person." Tourtellote, 2016

---

[7] Plaintiff does not argue it at summary judgment, and the Complaint does not adequately allege it, nevertheless the Court does not find anywhere in the record sufficient evidence to permit a hostile work environment claim to proceed, despite one fleeting mention of the term in the Complaint. (Compl. at ¶ 28.)

13

WL 146455, at *11 (citing Victor v. State, 203 N.J. 383, 408-409 (2010)).

Once a plaintiff has made out a prima facie case of retaliation, a presumption arises in favor of discrimination, which shifts the burden to the employer to "articulate a legitimate, non-discriminatory reason for the adverse employment action." Levine v. Voorhees Bd. of Educ., Civ. No. 07-1614 (RMB), 2009 WL 5171857, at *11 (D.N.J. Dec. 23, 2009).

Once the defendant carries that burden, the plaintiff must show that the legitimate business reason is merely pretext. More specifically, "[t]o defeat summary judgment at the pretext stage, 'the plaintiff must point to some evidence, direct or circumstantial from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" DiMare v. Metlife Ins. Co., 369 Fed. Appx. 324, 328 (3d Cir. 2010).

### i. Prima Facie Case

For purposes of its summary judgment motion, Defendant contests the third and fourth elements of the prima facie case of disability discrimination: that Plaintiff suffered an adverse employment action, and it happened under circumstances giving

14

rise to an inference of discrimination.[8] While the Court is very swayed by the Defendant's argument that Plaintiff has not demonstrated a prima facie case, narrow factual disputes prevent resolving the issue on summary judgment.

   **1. Adverse Employment Action**

Under the NJLAD, Plaintiff must demonstrate that he suffered an adverse employment action. Brown v. City of Long Branch, 380 Fed. Appx. 235, 238 (3d Cir. 2010). With regard to Plaintiff's claim that he suffered an adverse employment action, Defendant argues that the record is clear that the acceptance of his resignation or the refusal of Defendant to rescind that

---

[8] Typically, in the context of disability discrimination claims, courts have construed this to be a requirement that Plaintiff show that he was replaced by a similarly qualified person. Tourtellote, 2016 WL 146455, at *11 (citing Victor v. State, 203 N.J. 383, 408-409 (2010)). Neither party seeks to make argument concerning whether Plaintiff was replaced by a similarly-qualified individual. However, as all discrimination claims are highly fact intensive, this is not the only manner in which a plaintiff might demonstrate an inference of discrimination. See Glenn v. Lawrence Tp. Police Dept., 2012 WL 933335, at *5 (D.N.J. Mar. 20, 2012) (citing Williams v. Pemberton Twp. Pub. Sch., 733 A.2d 571, 578 (N.J. Super. Ct. App. Div. 1999) ("In light of the various contexts in which employment discrimination claims arise, we consider it unwise to require a plaintiff to establish unfailingly as part of the prima facie case that plaintiff was replaced by an individual outside the plaintiff's protected class[; t]he appropriate fourth element of a plaintiff's prima facie case requires a showing that the challenged employment decision (i.e., failure to hire, failure to promote, wrongful discharge) took place under circumstances that give rise to an inference of unlawful discrimination[; t]hat formulation permits a plaintiff to satisfy the fourth element in a variety of ways.").

resignation is not an adverse employment action, nor does any other action taken by Defendant amount to an adverse action. (Defs.' Br. at 9-10.)  In so arguing, Defendant relies upon cases which have held that refusal to rescind a resignation does not suffice to demonstrate an adverse employment action.  E.g., Williams v. Rowan University, Civ. No. 10-6542, 2014 WL 7011162, at *9 (D.N.J. Dec. 11, 2014).  Indeed, this Court held in Williams, "[a]n employer's refusal to allow an employee to rescind his resignation has been held not to be an adverse employment action."  Id.

If Plaintiff had indeed resigned, Defendant's would be correct in arguing that Williams would warrant a grant of summary judgment.  Reading the facts in the light most favorable to Plaintiff as this Court must, however, the Court finds Williams distinguishable.  Here, Plaintiff's theory of the case is that he did not communicate his resignation at any point. (Pl.'s Br. 8-9.)  Instead, Plaintiff contends that he conveyed his thought about resignation that was intentionally misconstrued by Mr. Immordino and others to be a resignation for purposes of eliminating his employment.  Such conduct, if true, would amount to an adverse employment action.

To put it delicately, the Court is very skeptical that Plaintiff could ever ultimately demonstrate to a jury that Mr. Immordino intentionally misconstrued his contemplated

16

resignation into a full-fledged resignation, while Mr. Kamel in a separate and independent conversation with Plaintiff on the same day also came away with the same misunderstanding that Plaintiff was resigning.  (See SOF at ¶ 37.)  Nevertheless, the Court is required to view the facts in the light most favorable to Plaintiff, resolving all factual disputes in his favor, including what he said to Mr. Immordino and Mr. Kamel.  Having done so, the Court determines that Plaintiff has demonstrated an adverse employment action for purposes of summary judgment.[9]

### 2. Inference of Discrimination

Defendant argues that Plaintiff's adverse employment action, to the extent there was one, did not occur under circumstances giving rise to an inference of discrimination.

---

[9] The Court does not, however, rule that Plaintiff has adequately supported an alternative theory of constructive discharge, which is mentioned in passing in his opposition brief.  (Pl.'s Opp. Br. at 6 ("It is Mr. Taha's position that the company came to resent his request for accommodation based upon his disability and pretextually raised bogus concerns about customer complaints, then ultimately constructively terminated him when it 'accepted' his supposed resignation.").)  Plaintiff's argument misconstrues the nature of constructive discharge, which requires the employee to resign.  In order to state a claim of constructive discharge under the NJLAD, conduct must be pointed to that is "so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Anastasia v. Cushman Wakefield, 455 Fed. Appx. 236, 240-41 (3d Cir. 2011).  Here, Plaintiff has vehemently denied that he resigned.  (Pl.'s Br. at 6, 8-9.)  Moreover, Plaintiff has not presented any briefing whatsoever on constructive discharge other than this single mention of the term.

Plaintiff has, once again barely, survived his obligation of making a prima facie of disability discrimination.

Although the Court is somewhat persuaded by Defendant's arguments, Plaintiff has adduced evidence that after Mr. Immordino became his district manager, he reminded Mr. Immordino of his disability. (Taha Dep. Ex. 22.) Eleven days later, complaints against him were trumped up and misconstrued, (Taha Dep. Ex. 25 (conversation with Mr. Kamel concerning complaints), and that Mr. Immordino misrepresented Plaintiff's contemplated resignation as a resignation. While on a neutral reading of the facts, it would seem likely Plaintiff was terminated because he had a copious number of complaints filed against him or did not have a personality match with Mr. Immordino, the proximity to Plaintiff's reporting of his disability to Mr. Immordino is sufficient to establish a prima facie case at summary judgment. This is particularly the case where Plaintiff has pointed to evidence that some complaints were to be expected against a manger and several against him were largely easily-explained misunderstandings.

### ii. Legitimate Business Reason

The legitimate business reason portion of the McDonnell Douglas test becomes slightly unwieldy under the facts of this case because it is not Defendant's position that they fired Plaintiff at all. Nevertheless, construing the facts in favor

18

of Plaintiff's narrative—that he was fired when Defendant intentionally misinterpreted his words as a resignation, Defendant has still shown a legitimate business reason for terminating Plaintiff. Specifically, the record is replete with complaints about Plaintiff's performance in his job. As such, assuming a jury were to find Plaintiff was terminated and did not resign, a jury may also find that Plaintiff's termination was for a legitimate business reason.

### iii. Pretext

Plaintiff claims that evidence of pretext exists in the form of accepting a resignation that Plaintiff did not offer. In other words: if Defendant knew that Plaintiff stated in essence, "I am thinking about resigning," and nevertheless, intentionally misconstrued that as "I resign," such an action is evidence of pretext. This coupled with the somewhat close proximity between Plaintiff's report of his disability and ultimate termination is "some evidence" from which the Court could disbelieve Defendant's articulated reason. This is particularly so where Defendant has pointed to no evidence that there was any plan to fire Plaintiff before his re-report of his disability and his supposed "resignation."

## IV. CONCLUSION

By the slimmest of margins, Plaintiff has survived summary judgment. While the Court is skeptical, material factual

19

disputes exist concerning Plaintiff's claim of disability discrimination. As such, the Court is unable to grant summary judgment.[10]

DATED: April 26, 2016

                                      s/Renée Marie Bumb
                                      RENÉE MARIE BUMB
                                      UNITED STATES DISTRICT JUDGE

---

[10] As noted, supra note 6, the Court does not today address Defendant's ultimate ability to inquire into Mr. Carter's counsel to Mr. Taha after his purported resignation. Likewise saved for another day is the potential issue of whether Mr. Carter may ultimately be disqualified as Plaintiff's counsel, a topic which was discussed at oral argument.